George Haines, Esq.
Nevada Bar No. 9411
**FREEDOM LAW FIRM**
8985 S. Eastern Ave., Suite 350
Las Vegas, NV 89123
Telephone: (702) 880-5554
Facsimile:  (702) 385-551
georgehaines@freedomlegalteam.com

*Attorneys for Plaintiffs Richard Klein, Raymond Urias, Sandra Gunter and all others*
*similarly situated*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT KLEIN, RAYMOND URIAS, AND SANDRA J. GUNTER, individually and on behalf of all others similarly situated; | Case No.: 2:22-cv-01392-GMN-BNW |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT AMERICAN EDUCATION SERVICES, LLC'S MOTION TO DISMISS** |
| v. | |
| National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2007-1; National Collegiate Student Loan Trust 2007-2; National Collegiate Student Loan Trust 2007-3; National Collegiate Student Loan Trust 2007-4; Pennsylvania Higher Education Assistance Agency d/b/a American Education Services; and Transworld Systems, Inc., | |
| Defendants. | |

Plaintiffs Richard Klein, Raymond Urias, and Sandra J. Gunter ("Plaintiffs"),

individually and on behalf of all others similarly situated hereby submit this response

in Opposition to Defendant American Education Services, LLC's ("AES") Motion to

1

Dismiss Plaintiffs' First Amended Complaint (ECF No. 42).

## I. INTRODUCTION

AES moves to dismiss Plaintiffs' first amended complaint (FAC) under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted. (ECF No. 42, p.7). Contrary to AES's arguments, (1) the bankruptcy court has already determined Plaintiffs' loans were discharged; (2) Plaintiffs have Article III standing; and (3) Plaintiffs' claims do not fail as a matter of law. Accordingly, AES's Motion to Dismiss should be denied.

## II. BACKGROUND

Under the Bankruptcy Code, private student loans are not dischargeable in bankruptcy if they are "qualified education loans," meaning they are incurred by eligible students at eligible institutions, for eligible education expenses—the cost of attendance at a qualified educational institution. 11 U.S.C. § 523(a)(B); 26 U.S.C. § 221(d)(1)–(2). However, "non-qualified," direct-to-consumer loans, including those made to students at eligible schools that exceed the cost of attendance, are not qualified education loans and, accordingly, are dischargeable in bankruptcy.

Trust Defendants are Delaware-based debt servicers organized between 2001 and 2007 that focus on private student loans they are assigned and, as their "principal business," "collect[] on defaulted loans through collection letters, lawsuits, post-judgment collection efforts, and report[] the loans to consumer reporting agencies."

(ECF No. 20, ¶¶70–71). "The basic purpose of each Defendant is to acquire a pool of private student loans issue notes secured by that pool of student loans, and to service and collect on those student loans." *Id.* at ¶72. The Trust Defendants acquired more than 800,000 private student loans from originating lenders, including those of Plaintiffs. *Id.* at ¶82.

AES is a Pennsylvania public corporation and government instrumentality that guarantees and services student loan debt across the country, including in this District. *Id.* at ¶18. AES serviced the student loans co-signed by Plaintiffs. *See id.* at ¶¶88, 123, 142.

Plaintiffs each co-signed a private student loan for a child or relative that was later assigned to AES and one of the Trust Defendants;[1] however, in each case these loans exceeded the cost of attendance and were, accordingly, not qualified education loans. In May 2007, Mr. Klein co-signed a private student loan for his daughter, who was 23 and no longer lived with him, to borrow $5,464.00 to attend the University of Nevada, Las Vegas for the 2007–08 academic year. *Id.* at ¶¶87–90. Mr. Klein's daughter was not his dependent when he co-signed, she never attended the school, the loan was paid directly to the daughter, and the loan amount exceeded the cost of attendance of $3,622.50 for UNLV in that term, so the loan was a "mixed use" loan not a qualified education loan under 11 U.S.C. § 523(a)(8)(B). *Id.* at ¶92–95. *See also* 26 U.S.C. §

---

[1] For instance, Mr. Klein's loan was assigned to "AES/NCT." NCT stands for National Collegiate Delaware Trust and designates one of the Trust Defendants.

3

221(d)(1); 26 C.F.R. § 1.221-1(e)(4) (defining mixed-use and qualified education loans with examples).

Mr. Urias similarly "co-signed on a private student loan for his nephew, who borrowed approximately $10,000" to attend UNLV when the nephew was not a dependent, the loan was paid directly to the nephew, and the loan exceeded the cost of attendance. (ECF No. 20, ¶118–19, 126–27). Finally, Ms. Gunter "co-signed on a 'private student loan' for her daughter" for $20,000 "to attend the College of Southern Idaho . . . ," which far exceeded the cost of attendance. *Id.* at ¶140, 144–45.

All three Plaintiffs filed for bankruptcy under Chapter 7 or Chapter 13 in the United States Bankruptcy Court for the District of Nevada. *Id.* at ¶¶98, 121, n.3, 140, n.5. The obligations to Trust Defendants and AES were scheduled in each bankruptcy proceeding and they received notice of the bankruptcy. *Id.* at ¶¶99, 129, 141. Following the bankruptcy petitions, an "automatic stay" barred other legal proceedings related to Plaintiffs' debts and barred reporting of collection information by any of the Defendants. *Id.* at ¶100; *see id.* at ¶¶130, 150.

Defendants did not request relief from the "automatic stay" codified at 11 U.S.C. § 362 *et seq.*, which prohibits creditors included in a consumer's bankruptcy from engaging in collection activities while the bankruptcy was pending to pursue the consumer on any personal liability for any of the underlying debts. *Id.* at ¶¶102, 132, 152. Nor did Defendants file any proceedings to declare their alleged debts "non-dischargeable" pursuant to 11 U.S.C. § 523 *et seq. Id.* at ¶¶101, 131, 151.

All three Plaintiffs received a bankruptcy discharge under 11 U.S.C. § 727, and just like most of Plaintiffs' consumer debts, their private student loans were discharged in the bankruptcy proceedings. *Id*. at ¶¶103–04; 133–34, 153–54.

Since Plaintiff's bankruptcy discharges, Defendants have continued to report the private student loan debt on their credit reports in "current" status with a current balance that is still due and owing. *Id*. at ¶105–08. With respect to each Plaintiff, the representations that the debt on the private student loan is due and owing are false and misleading as Plaintiff does not owe a debt to Defendants. *Id*. at ¶111. As a result of Defendants' unlawful debt collection practices, including obtaining a default judgment and garnishment in the case of Mr. Urias, Plaintiffs have paid money not owed, and as a result of Defendants' unlawful credit reporting, Plaintiffs have experienced emotional distress arising out of the actions complained of. *Id*. at ¶¶110, 116, 135–37, 139.

As a matter of policy and practice, Defendants regularly and consistently fail to engage in any efforts to ensure the debts upon which they attempt to collect are not subject to a bankruptcy discharge, or to inform debtors of the fact that private student loans were only non-dischargeable if they satisfy Section 523(a)(8)(B). *Id*. at ¶¶161, 44–46. Defendants' failure to identify and eliminate discharged debts constitute their standard procedure for conducting their debt collection activities. *Id*. at ¶162.

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs brought this action individually and on behalf of a class initially defined as:

*National Class*: All persons who obtained non-qualified education loans that were not reaffirmed or excepted from discharge under any provision of section 523(a)(8) prior to them filing bankruptcy and were subsequently discharged in their bankruptcy, but Defendants have continued to collect on these debts as if the "student loans" were not discharged in bankruptcy.

*Nevada Class*: All residents of Nevada whose "private student loans" were incurred prior to them filing bankruptcy and then these loans were subsequently discharged in their bankruptcy, but Defendants have continued to collect on these debts as if the "student loans" were not discharged in bankruptcy.

*Id*. at ¶164.

Under federal bankruptcy laws, Plaintiffs' and Class Members' discharge orders fully and completely discharge all statutorily dischargeable debts incurred prior to the filing of bankruptcies, except for those that have been: (1) reaffirmed by the debtor in a reaffirmation agreement; or (2) successfully challenged as non-dischargeable by one of the creditors in a related adversary proceeding. For Plaintiffs and Class Members, the debts at issue have been discharged through bankruptcy. *Id*. at ¶164. Meanwhile, Defendants continuously breached obligations under federal and state debt collection laws in endeavoring to collect on these already-discharged debts. *Id*. at ¶ 163.

### III. ARGUMENT

### A. Legal Standard

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain[] enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). "District courts must apply a two-step approach when considering

motions to dismiss." *Amistad Christiana Church v. Life is Beautiful, LLC*, 132 F. Supp.3d 1246, 1250 (D. Nev. 2015) (citing *Iqbal*, 556 U.S. at 679). First, the court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences therefrom in the plaintiff's favor. *Id.* (citations omitted). "Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief." *Id.* (citing *Iqbal*, 556 U.S. at 679). "A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Id.* at 1250–51 (citing *Iqbal*, 556 U.S. at 663). "Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the district court to draw on its judicial experience and common sense." *Id.* at 1251 (cleaned up).

## B. The Nevada Bankruptcy Court Has Already Determined Plaintiffs' Loans Were Discharged

AES first argues that what it characterizes as the "threshold issue" of a "determination that the Disputed Loans were dischargeable" was not addressed by the bankruptcy court in its discharge orders. (ECF No. 42, at p.10). To the contrary, the FAC alleges and Plaintiffs contend that the discharge orders entered by the bankruptcy court in each of their cases (and those of class members) did in fact discharge the loans at issue here. (*see, e.g.,* ECF No. 20, at ¶¶103–04). While stating that "most student loans" were "*not* discharged," the discharge orders necessarily recognized that some student loans were. *Id.* at Exs. D, H, and L. Accordingly they recognized, *inter alia*,

Section 523's exceptions to discharge, including the requirement that loans be dischargeable if they are not "to repay funds received as an educational benefit" or are not otherwise "qualified education loan[s]" (i.e., they exceed the cost of attendance). 11 U.S.C. §§ 523(a)(8)(A)(ii), (B).

AES's reliance on *Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186 (9th Cir. 2011), is unavailing. Plaintiffs here do not seek a determination that the loans at issue are discharged, since Plaintiffs contend the bankruptcy court's discharge orders already made that determination; rather, they seek enforcement of the discharge orders through injunctive relief based, *inter alia*, on contempt. AES argues that the appropriate action would be to initiate an adversary proceeding in the bankruptcy court, but *Barrientos* held that was precisely the wrong procedure to obtain the remedy Plaintiffs seek. *See Barrientos*, 633 F.3d at 1189 (holding adversary proceeding is unavailable to pursue contempt for violation of discharge order). Although this Court may determine it is not empowered to enter contempt based on the bankruptcy court's discharge orders, as discussed below, it should nevertheless refer this case to the bankruptcy court to enforce those orders under Local Bankruptcy Rule 1001 rather than dismissing this case. *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 505 (noting that district court referred contempt claim to bankruptcy court rather than dismissing it).

### C. Plaintiffs Have Article III Standing

AES next argues Plaintiffs lack Article III standing because they failed to allege injury-in-fact. "When faced with a Rule 12(b)(1) motion, the plaintiff bears the burden

of proving the existence of the court's subject matter jurisdiction." *In re Consolidated Meridian Funds*, 485 B.R. 604 (Bankr. W.D. Wash. 2013) (citing *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996)). "To satisfy Article III standing, '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "An injury qualifies as 'concrete' if it is 'real' rather than 'abstract'—that is, 'it must actually exist.'" *Id.* (quoting *Spokeo*, 578 U.S. at 340).

AES relies on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021), and asserts that like the plaintiffs in *TransUnion*, Plaintiffs have not shown concrete harm. This argument is without merit. In *TransUnion*, the Supreme Court held the plaintiffs had not shown either (1) "the risk of future harm materialized—that is, that the inaccurate OFAC alerts in their internal TransUnion credit files were ever provided to third parties or caused a denial of credit"; *or* (2) "that the class members were independently harmed by their exposure to the risk itself—that is, that they suffered some other injury (such as an emotional injury) from the mere risk that their credit reports would be provided to third party businesses." *Id.* at 2211. Had they shown either, the Supreme Court held, the requirement for concrete harm would have been satisfied. *See id.*

Here, unlike the Plaintiffs in *TransUnion*, Plaintiffs have alleged they and the Class Members "were (and continue to be) damaged as a direct and proximate result of Defendants' unlawful conduct including without limitation, fear of credit denials, out of pocket expenses in challenging the accurate reporting, damage to their creditworthiness, emotional distress, loss of privacy, and other economic and non-economic harm . . . ." (ECF No. 20, ¶292) While doubtless many of the Plaintiffs' and Class Members' impacted credit reports were in fact provided to prospective lenders, employers, or landlords, Plaintiffs have adequately alleged "other injury (such as emotional injury) from the mere risk that their credit reports would be provided to third party businesses." *TransUnion*, 141 S. Ct. at 2211.

These emotional injuries arising from the concern about impacts on Plaintiffs' and Class Members' creditworthiness are also detailed elsewhere in the complaint. For instance, Plaintiffs specifically alleged Mr. Klein "experienced anxiousness and hopelessness as he was forced to re-live the stress of debt collection activities and felt he lost the benefit of the fresh start he should have received after his bankruptcy discharge," and "[his] credit worthiness was also negatively affected as a result of AES's[] unlawful behavior complained of herein." (ECF No. 20, at ¶116–17); *see also id.* at ¶292 ("[Mr. Klein] and the Class Members were (and continue to be) damaged . . . including without limitation, fear of credit denials out-of-pocket expenses in challenging the inaccurate reporting, damage to their creditworthiness, emotional distress, loss of privacy, and other economic and non-economic harm."). Similarly, as

another example of emotional injuries alleged, Plaintiffs specifically alleged Mr. Urias "has experienced emotional distress resulting from the stress, anxiety, fear, anger, and frustration he experienced arising out of the actions complained of herein." *Id.* at ¶139.

Plaintiffs' injuries due to risk of loss of creditworthiness extend to pecuniary injury as well, because "when a Class Member needs to rent a car, obtain employment or rent an apartment, or other similar transactions, and they are advised by Defendants they will not remove the erroneous information unless they pay the debt, Class Members often pay the debt despite the fact that it has been discharged in bankruptcy." *Id.* at ¶246.

Finally, these alleged injuries extend not merely to allegations of violations of the FCRA, but to "all of the actions complained of [in the FAC]." *Id.* at ¶139. Each claim expressly incorporates previous allegations. *See id.* at ¶¶266, 268, 294, 297, 302, 316.

Accordingly, Plaintiffs have adequately alleged injuries that are concrete for each claim under *TransUnion* and, contrary to AES's arguments, Plaintiffs' allegations do not "rely on a nonexistent automatic right to recover damages based on the alleged statutory violations by AES." (ECF No. 42, at p.13). Plaintiffs have shown Article III standing. AES's motion to dismiss for lack of subject matter jurisdiction should be denied.

////
////
////

### D. Plaintiffs State Plausible Claims for Relief

Next, AES argues that Plaintiffs' claims fail as a matter of law because they are "speculative" under *Bell Atlantic Corp v. Twombly*, 550 U.S. at 555. Contrary to AES's arguments, Plaintiffs have stated plausible claims for relief.

#### i.      *Plaintiffs' FCRA Claim is Valid*

AES argues that Plaintiffs' FCRA claim is not plausible because it alleges there is an unresolved legal question here and, under a recent Second Circuit decision, "[an] unresolved legal question regarding the application of section 523(a)(8)(A)(i) to [] [the debtor's] educational loan render[ed] his claim non-cognizable under the FCRA." *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264 (2d Cir. 2023). The decision in *Mader* is nonbinding and in any event it does not apply here because, unlike the dispute over the definition of the statutory term "program" in that case, there is no serious legal dispute about whether loans which exceed the cost of attendance are dischargeable in bankruptcy (they are), only a factual dispute over whether the loans at issue here were discharged by the bankruptcy court's discharge orders.

Although both *Mader* and this case involve loans the defendants contend were not discharged for educational purposes, the exception to bankruptcy discharge the plaintiff in *Mader* relied upon—§ 523(a)(8)(A)(i)—demanded the result there because it required legal analysis of an ambiguous clause: "made under any program funded in whole or in part by" the government or a nonprofit. The Second Circuit noted that acknowledging the cognizability of a claim under this subsection would have required

interpreting the term "program" narrowly enough to avoid bringing all education loans within its ambit, and it further noted courts had disagreed about the level of specificity required when identifying a qualifying "program" under the § 523(a)(8)(A)(i) exception. *Id.* at 268–69. Here, in contrast the question is simply whether the loan is a "qualified education loan" under § 523(a)(8)(B), which only involves a question of whether the loan covered the "cost of attendance" under 26 U.S.C. § 221(d)(2) and 20 U.S.C. § 1087ll (1986). These statutes clearly define the costs included in the term such as "tuition and fees" and "room and board," which are readily ascertainable, and do not carry the ambiguity inherent in construing the term "program." Accordingly, the inaccuracy alleged here does not involve the sort of "unsettled" legal question rejected in *Mader* and does not "evade[] objective verification," but is easily resolved. Because the loans exceeded the cost of attendance at the respective institutions, the loans at issue were dischargeable in bankruptcy under section 523(a)(8)(A)(ii) and discharged by the discharge orders in each respective bankruptcy case.

### ii.    *Plaintiffs' Unjust Enrichment Claim is Valid*

AES next argues that Plaintiffs' unjust enrichment claim fails. Plaintiffs have stated a plausible claim for relief for unjust enrichment against AES, which requires "receipt of a benefit and unjust retention of the benefit at the expense of another." *In re Yu Hua Long Invs., LLC*, 2023 WL 128615, at *1 (9th Cir. Jan. 9, 2023). Plaintiffs allege AES and other defendants have continued to attempt to collect and have successfully wrongfully collected debt on loans that were in fact discharged. (ECF No.

20, at ¶260). They did so by misrepresenting to Plaintiffs—and to third parties via inaccurate credit reporting—that the debts were still due and owing. By inaccurately representing the status of these loans to credit rating agencies and negatively affecting Plaintiffs' credit scores, AES and other Defendants coerced Plaintiffs to make payments. *Id.* at ¶259–61.

AES cites the voluntary payment doctrine as a defense. Under Nevada law, "[t]he voluntary payment doctrine is an affirmative defense that 'provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment.' " *Nevada Ass'n Servs., Inc. v. Eighth Jud. Dist. Ct.*, 338 P.3d 1250, 1253 (Nev. Sup. Ct. 2014) (quoting *Best Buy Stores v. Benderson-Wainberg Assocs.*, 668 F.3d 1019, 1030 (8th Cir. 2012)). "The 'voluntary' in the voluntary payment doctrine does not entail the mere payment of the bill or fee. Instead, it considers the willingness of a person to pay a bill *without protest as to its correctness or legality*." *Id.* (cleaned up) (emphasis in original). Moreover, even if the defense is properly raised, it will not apply if an exception applies, including "fraud, coercion, or mistake of fact." *Id.* at 1254 (citing *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 666 (7th Cir. 2001). Here, Plaintiffs have protested that the debts were owed by attempting to revise their credit reports while Defendants, including AES, decline to do so. (*e.g.,* ECF No. 20, at ¶245). Even assuming, *arguendo*, payments were voluntarily made and the doctrine applies, Plaintiffs allege a course of conduct by AES and other

Defendants establishing that exceptions apply which preclude application of the doctrine, including fraud, coercion, and mistake of fact. *See id.* at ¶¶242–60.

Accordingly, Plaintiffs' have stated a plausible claim for relief for unjust enrichment.

### iii.    Plaintiffs' NDTPA Claim is Valid

AES argues Plaintiffs' NDTPA claim fails because the NDTPA does not apply to the conduct at issue here, and because the claim is not adequately pled. AES is wrong on both counts.

First, even assuming consumer lending is not a "service[]" under the NDTPA (an issue not previously decided by Nevada courts), the NDTPA's 'catch-all provision' extends protections beyond the sale or lease of goods or services.

Nev. Rev. Stat. § 41.600(2)(e) provides that "any person who is a victim of consumer fraud may bring a cause of action against the alleged perpetrator." "Consumer fraud includes '[a] deceptive trade practice' as defined by the NDTPA." *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 138 Nev. Adv. Op. 55, 514 P.3d 425, 429 (2022) (quoting NRS 41.600(2)(e)). Under the NDTPA, "Deceptive trade practices" are defined broadly through a catch-all provision which prohibits a person "in the course of his or her business or occupation" from "[k]nowingly mak[ing] any other false representation in a transaction." Nev. Rev. Stat. § 598.0915(15).

AES does not cite Nevada state law to support its position. Nevada courts have not conclusively held whether conduct by lenders to consumers is covered by the

NDTPA. However, while other "deceptive trade practices" prohibited under § 598.0915 "apply specifically to the sale or lease of goods or to retail installment transactions," the Supreme Court of Nevada has held in an unpublished decision that "NRS 598.0915(15) could apply to [other] transactions." *Davenport v. GMAC Mortg.*, 129 Nev. 1109, 2013 WL 5437119, at *2 (unpublished disposition). Accordingly, one need only be engaged "in the course of his or her business or occupation" when "making a false representation in a transaction" for one's act to fall within the ambit of this provision. That "transaction" is not limited to one for sale or lease of goods or services. In *Davenport*, the transaction was for the sale of real estate. *Id.* Here, the transactions into which Defendants, including AES, entered were the original loans which they assumed and their subsequent wrongful attempts to collect on those loans. Irrespective of conflicting interpretations from prior decisions of federal district courts, this court should be persuaded by the clearest pronouncement of the highest court of the state on this state-law matter.

Second, AES argues the NDTPA claim was not pled with sufficient particularity. Plaintiffs have alleged that "Defendants," including AES, violated the NDTPA by "knowingly making false representations regarding Plaintiffs' legal rights and obligations regarding the alleged debts." (ECF No. 20, ¶317). Although Defendants make the conclusory argument that the complaint does not state specific facts about when Defendants violated the NDTPA or made the false representations alleged, the complaint makes these allegations throughout and incorporates them by reference in the

NDTPA claim, which specifically references "the above detailed conduct." *Id.* at ¶316–17. The false representations alleged in the FAC include, for example, Defendants:

- falsely reporting to third parties that Plaintiffs' loans were past due and owing;

- asserting to Plaintiffs that these discharged loans were past due and owing;

- threatening in dunning letters to make false reports to Plaintiffs' credit reports; and

- advising Plaintiffs and members of the class that the erroneous and harmful information will remain on their credit reports for at least seven years.

*Id.* at ¶¶231–35, 245.

This NDTPA claim is stated with the requisite particularity. Plaintiffs state a valid claim under the NDTPA.

    iv.    *Plaintiffs' Section 524 Claim is Valid*

AES argues that under *Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502, 504 (9th Cir. 2002), and Plaintiffs concede, that there is no private cause of action under Section 524. However, the Court in *Walls* also recognized the traditional remedy for a claim for violation of a discharge injunction under Section 524: injunctive relief, including a contempt proceeding under 11 U.S.C. § 105(a). *See Walls*, 276 F.3d at 505 ("The district court granted Walls's motion by referring her claims . . . for contempt on account of the alleged violation of the automatic stay and the discharge injunction, to the bankruptcy court."). As the scope and remedy of the discharge orders for Plaintiffs and Class

Members are "core" bankruptcy matters, and the United States District Court for the District of Nevada has referred all bankruptcy matters to bankruptcy judges in its local rules, Plaintiffs respectfully request this court automatically refer Plaintiffs' and Class Members claims under Section 524 and this entire action to the bankruptcy court under Local Bankruptcy Rule 1001. Bankr. D. Nev. R. 1001. *See In re Homaidan*, 640 B.R. 810 (Bankr. E.D.N.Y. July 8, 2022), *appeal dismissed sub nom. Navient Sols., LLC v. Homaidan*, No. 17-AP-1085(ESS), 2022 WL 4079579 (E.D.N.Y. Sept. 6, 2022) (granting injunctive relief because, *inter alia*, plaintiff had shown a likelihood of success on the merits for alleged discharge order injunction violations of plaintiff *and* putative class members under Section 524). Accordingly, Plaintiffs request this court refer all core matters, including both Plaintiffs and Class Members' Section 524 claims to the bankruptcy court which, having originated Plaintiffs' discharge orders, has authority to enforce those orders through contempt. This is precisely the "injunctive relief, and all appropriate damages and other recovery . . . pursuant to the Court's inherent powers and its statutory 11 U.S.C. § 105(a) powers" sought by plaintiffs. (ECF No. 20, ¶301). While referral to the bankruptcy court is appropriate, as Plaintiffs merely seek to enforce through contempt orders of the bankruptcy court, which "operates as an injunction against the commencement or continuation of an action, the employment of process or an act to collect, recover or offset any such debt as a personal liability of the debtor," 11 U.S.C. § 524(a)(2), dismissal of this claim is inappropriate under *Walls*.

////

*v.*   *Plaintiffs' Declaratory Judgment Claim is Valid*

AES also argues Plaintiffs lack standing to bring a declaratory judgment claim on the grounds that their bankruptcy proceedings have ended and, in the case of Mr. Klein and Mr. Urias, they have repaid their loans due to inaccurate and illegal reporting by Defendants. (ECF No. 39, p.8). But while some of the harms alleged in the FAC have passed, other harms are ongoing. In particular, Plaintiffs repeatedly allege not only that Defendants have made inaccurate credit reports to credit reporting agencies in the past, but that they continue to do so and, most importantly, that they are continuously "failing to properly investigate disputes concerning the inaccurate data Defendants are reporting in consumers' credit files, and failing to correct such inaccuracies, which Defendants knew or should have known were erroneous and which caused Plaintiffs' and the Class damages." (ECF No. 20, ¶155). Accordingly, Defendants' conduct in failing to correct past inaccurate credit reports—and the damages Plaintiffs and Class Members suffer and will continue to suffer from that continued failure—is ongoing. This failure to correct inaccurate credit information is itself a violation of the discharge orders, which operate as injunctions under Section 524. These continuous harms are "real and substantial." *California v. Texas*, 210 L.Ed.2d 230, 141 S.Ct. 2104, 2115–16 (citation omitted). Obtaining a declaratory judgment that the bankruptcy discharge orders in the cases of Plaintiffs and Class Members discharged the loans at issue "admit[s] of specific relief through a degree of a conclusive character," and injunctive relief would abate the ongoing harms of Plaintiffs and Class Members.

Accordingly, Plaintiffs have standing to pursue declaratory judgment on behalf of themselves and Class Members, and this claim should not be dismissed.

> vi.    *Plaintiffs' Claims Are Not Barred by* Walls

Finally, AES argues that, under *Walls*, besides the claim based on Section 524, all of Plaintiffs' other claims are barred as well, including the claims for unjust enrichment, and violations of the FDCPA, FCRA, and NDTPA.

In *Walls*, the plaintiff alleged claims not only for willful violation of the automatic stay of the bankruptcy court and for contempt for violation of the discharge injunction under Section 524, which were referred to the bankruptcy court as core bankruptcy matters, but also claims for violation of "an implied right of action under § 524, and for violation of the FDCPA." *Walls*, 276 F.3d at 505. While, as previously discussed, the Ninth Circuit held that Section 524 did not create or imply a private right of action for an order other than contempt, *id.* at 506–09, it also addressed the plaintiff's FDCPA claim. The plaintiff argued that the Bankruptcy Code did not preclude a simultaneous claim under FDCPA. The Ninth Circuit rejected this argument, "read[ing] the two competing statutes jointly" under *Ruckelshaus v. Monstanto Co.*, 467 U.S. 986 (1984), and concluding that the FDCPA claim was "based on an alleged violation of § 524" and "necessarily entails bankruptcy-laden determinations." *Id.* at 510. The Court concluded that "[n]othing in either Act persuades us that Congres intended to allow debtors to bypass the Code's remedial scheme when it enacted the FDCPA." *Id.* Accordingly, to determine whether a claim is precluded by Section 524, this court must

read the two competing statutes together and determine whether there is an irreconcilable conflict.

While Plaintiffs contend that *Walls* was wrongly decided on this point, they concede that *Walls* binds this Court with respect to like cases.  But unlike the FDCPA claim in *Walls*, Plaintiffs' claim is not "based on an alleged violation of Section 524." The FCRA claim is not duplicative of Section 524. Plaintiffs have alleged that Defendants violated the FCRA by reporting inaccurate information without reasonable care that is the violation of the FCRA, not by collecting a debt. While a creditor might use reports to credit rating agencies in an attempt to coerce payment, collection itself is incidental to the conduct prohibited by the Act. Accordingly, Section 524 and the FCRA are not competing statutes but complementary, because they prohibit entirely different acts.  So *Walls* does not preclude Plaintiffs' FCRA claim.

Similarly, the Declaratory Judgment Act claim can be harmonized with Section 524 because they provide different relief. While Section 524 "operates as an injunction against collecting debt as a personal liability of the debtor," *Walls*, 276 F.3d at 504, "'[t]he express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy . . . ." *Steffel v. Thompson*, 415 U.S. 452 (1974) (quoting S. Rep. No. 1005, 73d Cong., 2d Sess. (1934)); *see id.* at 469 ("The Court has recognized that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other." (cleaned up)).

Finally, Plaintiffs' state law claims for unjust enrichment and violations of the NDTPA are not preempted by Section 524. While the Court in *Walls* was required to "read two competing statutes jointly" and harmonize congressional intent, that analysis is inapplicable to state-law claims, as the requirement to harmonize the intent behind competing federal statutes does not extend to harmonizing Congressional intent with that of state legislatures. AES cites no binding authority that Section 524 preempts state-law claims.

Alternatively, assuming this Court determines all of these claims are based on an alleged violation of Section 524 or include bankruptcy-laden determinations, Plaintiffs respectfully request that, rather than dismissing them, this Court refer these claims to the bankruptcy court because such determinations involve "core" bankruptcy proceedings under Local Rule of Bankruptcy Practice 1001.

WHEREFORE, Plaintiffs respectfully request the Court deny AES's Motion to Dismiss and, in the alternative, refer Plaintiffs' claims on behalf of themselves and putative class members to the bankruptcy court pursuant to Local Rule of Bankruptcy Practice 1001.

Dated: April 10, 2023

FREEDOM LAW FIRM

 /s/ George Haines
George Haines, Esq.
Gerardo Avalos, Esq.

8985 S. Eastern Ave., Suite 350
Las Vegas, Nevada 89123

MILBERG COLEMAN BRYSON PHILLIPS
PLLC

/s/Scott C. Harris (Admitted Pro Hac Vice)
Scott C. Harris, Esq.
sharris@milberg.com
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5003

/s/Gary M. Klinger (Admitted Pro Hac Vice)
Gary M. Klinger, Esq.
gklinger@milberg.com
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
(866) 252-0878

*Attorneys for Plaintiffs*